RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
 *Executive Lens LLC*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE LENS LLC,<br><br>         Plaintiff,<br><br>   vs.<br><br>LEE RAPKIN and JOHN DOE dba "the Exposer" www.youtube.com@1aAudits Exposé,<br><br>         Defendant. | Case No. 5:25-cv-06048-NC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **Misrepresentation, 17 U.S.C. § 512(f);**<br><br>2. **Declaratory Judgment, 17 U.S.C. § 512(g)(2)(C) and 28 U.S.C. § 2201** |

Plaintiff, Executive Lens LLC ("Plaintiff"), files this First Amended Complaint against Lee Rapkin ("Attorney Rapkin") and John Doe d/b/a "the Exposer" (the "Exposer") who operates the 1a Audits Exposé YouTube channel located at www.youtube.com@/1aAuditsExposé (The "Exposé Channel") and alleges as follows:

## INTRODUCTION

1. This action concerns the misuse of the Digital Millennium Copyright Act's ("DMCA") counter-notice process by individuals, including attorneys, to maintain monetized videos on YouTube notwithstanding the absence of lawful fair use.

2. Over the past several years, a growing number of YouTube channels have been built on the unauthorized use of copyrighted footage created by others. These channels repost substantial portions of original works without permission, add little or no meaningful transformation, and monetize the resulting videos through YouTube's Partner Program while invoking "fair use" as justification.

3. While some reaction-style videos may qualify as fair use, courts have emphasized that such works must include genuine critique, frequent and substantive commentary, and a transformative purpose.

4. When copyright owners such as Plaintiff submit takedown notices under 17 U.S.C. § 512(c), infringing channels often respond by filing counter-notices under § 512(g), swearing under penalty of perjury that the removed material was taken down as a result of "mistake or misidentification" and that the use is protected by fair use.

5. Many such counter-notices are submitted without a reasonable factual or legal basis. They are often filed without a meaningful review of the videos at issue, without application of the statutory fair-use factors, or with the expectation that the copyright owner will be deterred from pursuing litigation.

6. In practice, invoking "fair use" in a counter-notice triggers YouTube's automated reinstatement process under 17 U.S.C. § 512(g), even where the asserted basis for fair use is inaccurate or unsupported, unless the copyright owner initiates federal litigation within the statutory waiting period.

7. As a result, anonymous channel operators increasingly enlist attorneys to submit counter-notices on their behalf using standardized or boilerplate language to invoke fair use, while avoiding identification by failing to comply with the disclosure requirements of 17 U.S.C. § 512(g)(3)(D). YouTube's automated counter-notice system does not independently cross-reference the channel owner against the information submitted in the counter-notice, permitting anonymity to be maintained notwithstanding noncompliance with the statute.

8. In this case, Attorney Rapkin, an attorney admitted to practice in Quebec and employed by BLP Avocats in Montréal, submitted a blanket counter-notice on behalf of an anonymous client operating the Exposé Channel. The counter-notice covered seventeen videos: sixteen YouTube Shorts and one long-form video (the "17-Videos").

9. In the counter-notice, Rapkin certified under penalty of perjury that each of the 17-Videos had been "significantly transformed by detailed editing and elaborate commentary throughout the videos."

10. That certification was materially false. At least eight of the videos contain no commentary whatsoever. The remaining videos consist primarily of Plaintiff's original footage with minimal or token additions, including unrelated clips from television shows or movies that serve only to mock the subject and do not transform the underlying work. None of the 17-Videos contains anything resembling "elaborate commentary throughout."

11. For avoidance of doubt, Plaintiff does not contend that the mere inclusion of unrelated audiovisual clips, images, sound effects, or pop-culture references constitutes "commentary" for purposes of fair use or for purposes of sworn certification made in the counter-notice. None of those elements involve analysis, critique, explanation, or engagement with the substance of the 17-Videos. The sworn representation that each video contained "elaborate commentary throughout" was therefore false as a factual matter, not merely debatable as a matter of opinion or degree.

12. Rapkin submitted the same standardized justification across all seventeen takedown disputes, notwithstanding the significant factual differences among the 17-

3
**FIRST AMENDED COMPLAINT**

1  Videos. This reflects a deliberate course of conduct designed to preserve monetized content while avoiding identification of the actual channel operator.

13. Consistent with that scheme, the Exposer publicly boasted about hiding behind Attorney Rapkin and a purported corporate entity to evade accountability, taunting Plaintiff that his identity would never be discovered and he therefore could not be held liable. Upon information and belief, those representations were false, and no bona fide corporation owned or operates the Exposé Channel.

14. This action seeks to identify the anonymous operator of the Exposé Channel, hold Defendants accountable for material misrepresentations made in the counter-notice, and prevent reinstatement of the 17-Videos pursuant to 17 U.S.C. § 512(g).

## JURISDICTION AND VENUE

15. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and includes a claim for Declaratory Relief under 28 U.S.C. § 2201.

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

17. Attorney Rapkin consented to jurisdiction in the Northern District of California pursuant to 17 U.S.C. § 512(g)(3)(D) by submitting a DMCA counter-notification to YouTube. She did so knowingly, using her law firm email and digital signature. Her consent binds her to this forum regardless of her location or bar admission status. Plaintiff notes that such consent is a statutory prerequisite for a valid counter-notification under § 512(g).

18. The Exposer likewise consented to jurisdiction in this District under 17 U.S.C. § 512(g)(3)(D) by submitting the counter-notice to YouTube.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1400(a) because both Attorney Rapkin and the Exposer consented to jurisdiction in this District under 17 U.S.C. § 512(g)(3)(D).

//
//

## PARTIES

20. Plaintiff is a Colorado limited liability company and the sole owner of the copyrights in the videos published on the YouTube channels "Denver Metro Audits" and "Denver Metro Audits 2.0" (@DenverMetroAudits; @Denvermetroaudits2.0).

21. Attorney Rapkin is an attorney admitted to the Quebec bar. Attorney Rapkin submitted a DMCA counter-notice in the course and scope of her employment with the Canadian law firm BLP Avocats, using her firm email and contact information. Plaintiff reserves the right to name BLP Avocats as a defendant after further discovery.

22. Defendant John Doe, operating under the alias "The Exposer," runs a YouTube channel located at @1aAuditsExposé.

23. The Exposer's YouTube channel is a textbook example of an anonymous "reaction" channel, that is, a channel that creates no original content of its own, but instead lifts copyrighted footage from others, overlays superficial or token commentary (if any), and attempts to pass it off as transformative. The Exposer never appears on camera, and until recently, his location was completely unknown.

24. The Exposer claims that his channel exists to "expose the grift" of First Amendment auditors ("Auditors"). In reality, the channel monetizes stolen footage from those very same Auditors, ironically engaging in the exact behavior it purports to criticize. It is not journalism. It is not commentary. It is copyright infringement disguised as fair use, wrapped in a mask of moral outrage.

## FACTUAL ALLEGATIONS

25. YouTube is the largest video-sharing platform in the world and operates under the framework established by the DMCA.

26. The DMCA provides a process by which copyright owners may request the removal of infringing content through a notice-and-takedown mechanism. If the platform receives a valid takedown notice, it typically disables access to the allegedly infringing material.

27. The DMCA also allows the alleged infringer to submit a counter-notice

claiming that the use is authorized, lawful, or otherwise non-infringing. If the copyright owner does not initiate a federal lawsuit within 10 business days of receiving a counter-notice, YouTube is required by law to restore access to the disputed content pursuant to 17 U.S.C. § 512(g).

28. This statutory framework places the burden on copyright owners, particularly small independent creators and small publishers, to enforce their rights through litigation.

29. Infringers like the Exposer exploit this imbalance by targeting small creators who lack the resources to initiate a lawsuit after receiving a counter-notice.

30. In practice, this loophole allows anonymous, foreign-run, monetized YouTube channels to exploit copyrighted material created in the United States by invoking "fair use" without consequence or oversight.

31. In recent years, "fair use" has become a catchall defense on YouTube, used not to support legitimate critique, but to excuse the wholesale misappropriation of others' creative work.

32. The Auditor community on YouTube consists of small independent content creators who film interactions with government officials in public spaces to promote transparency and assert constitutional rights, primarily the First Amendment. These creators act as citizen journalists, watchdogs, and public advocates, documenting real-time government conduct and holding public officials accountable through video.

33. The Auditor movement has grown into a powerful and controversial force on social media. Auditors regularly publish their videos to YouTube channels, where they have collectively attracted millions of subscribers and billions of views. These creators often operate under channel names or aliases and have become recognizable figures in the digital civil rights ecosystem.

34. Plaintiff owns all copyrights to the videos uploaded to the YouTube channel Denver Metro Audits and related channels, which collectively have over 250,000 subscribers and more than 600 videos. The works have generated over 115 million views and sustained public engagement on issues of constitutional importance.

**FIRST AMENDED COMPLAINT**

35. A genre of YouTube creators known as "auditor trolls" has emerged in response. These creators produce reaction-style videos targeting Auditors. While they purport to offer criticism or commentary, their actual content typically consists of mockery, personal insults, and superficial narration that does not engage with the substance of the original videos. Their focus is ridicule, not critique.

36. The Exposer's YouTube channel is an example of such misuse. It provides no new message, no added insight, and no transformation of purpose. It simply repackages Plaintiff's footage with ridicule to attract viewers and generate revenue from Plaintiff's content. The Exposer creates no original content. He steals it and splices it together for ad revenue.

37. These additions rarely engage with the subject matter or journalistic value of Plaintiff's works. Instead, the Exposer mocks Auditors personally, their voices, mannerisms, appearances, emotional reactions, and private lives.

38. Plaintiff clarifies that while parody or mockery *can* be fair use, the mere mashup of unrelated, third-party copyrighted clips does not constitute commentary on the Plaintiff's work.

39. The Exposer has created at least 31 videos using Plaintiff's copyrighted footage: 19 YouTube Shorts and 12 long-form videos.

40. On July 4, 2025, Plaintiff's assignor filed DMCA takedown notices with YouTube requesting removal of 27 of the 31 videos (16 Shorts and 11 long-form videos).

41. YouTube complied and removed all 16 Shorts and one long-form video. The Exposer subsequently made the other 10 long videos and 3 Shorts private after receiving the strikes. A list of URLs for the 16 Shorts and 1 long video that were removed by YouTube is attached as **Exhibit A**.

42. Despite repeated communications, YouTube refused to remove the 10 long-form videos that had been made private. YouTube appears to have determined, possibly via an automated process, that these videos were protected under fair use. This determination was made outside the DMCA safe-harbor and without judicial input. It is

7
**FIRST AMENDED COMPLAINT**

1  not the role of anonymous YouTube staff to resolve the legal question of fair use under
2  U.S. copyright law.

3  ### *The Counter-Notice Triggered Restoration of the 17-Videos*

4    43. On July 14, 2025, Attorney Rapkin submitted a blanket DMCA counter-notice on behalf of the Exposer covering all 17-Videos (16 Shorts and 1 long-form). (the "Counter-Notice"). A copy of the Counter-Notice is attached hereto as **Exhibit B**.[1] Attorney Rapkin submitted the Counter-Notice as the Exposer's agent and co-participant in the copyright infringement scheme.

  44. In the Counter-Notice, Attorney Rapkin swore under penalty of perjury that the videos were removed "by mistake or misidentification" and that each was "significantly transformed by detailed editing and elaborate commentary throughout." These assertions were materially false.

  45. The systematic nature of Attorney Rapkin's misrepresentation, applying an identical fair use justification to 17 videos with varying levels of transformation (ranging from zero commentary to token clips), constitutes a reckless disregard for the truth. This was not a legal error or a subjective mistake regarding the nuances of fair use; it was a bad-faith administrative maneuver. Attorney Rapkin's failure to conduct a video-by-video review before signing a sworn declaration proves that her certification of elaborate commentary was made with the knowledge that the statement was not, and could not be, true for the entire set of videos.

  46. Rather than engaging in a legitimate fair use analysis, Attorney Rapkin engaged in perjury. By providing a single, blanket justification for 17 separate works, Attorney Rapkin sought to exploit YouTube's automated systems. This blanket approach is evidence of a knowing misrepresentation under § 512(f), as no reasonable person, let

---

[1] Although the Counter-Notice purports to cover the URLs for 17 videos, only 16 URLs were listed on the Counter-Notice. Attorney Rapkin did not include the following URL in the Counter-Notice: https://youtube.com/shorts/Hj-0PFw-l-g?si=unQyL7iIWj_OVQhs.

alone a licensed attorney, could truthfully swear that a video with zero commentary contains elaborate commentary throughout. Her intent was not to provide an accurate counter-notice, but to force a mass reinstatement of infringing content through deception.

47. The Counter-Notice also failed to identify the subscriber who posted the videos, as required by 17 U.S.C. § 512(g)(3)(D).

48. Upon receipt of the Counter-Notice, YouTube relied on Attorney Rapkin's sworn representations by initiating the statutory reinstatement process mandated by 17 U.S.C. § 512(g), including placing the 17-Videos on a restoration track and issuing formal notice that reinstatement would occur absent federal litigation. YouTube's initiation of this process constituted reliance on the Counter-Notice within the meaning of § 512(f), and directly caused Plaintiff to incur damages in the form of emergency litigation costs necessary to prevent reinstatement.

49. Upon receipt of the Counter-Notice, YouTube notified Plaintiff that the Counter-Notice was a legal request for reinstatement of the 17-Videos and that, unless Plaintiff provided evidence that it had commenced legal action against the Exposer within ten (10) business days, the removed videos may be reinstated to YouTube.

50. YouTube further instructed Plaintiff that the only means of preventing reinstatement was to initiate legal action against the Exposer and provide YouTube with evidence of that action within the statutory waiting period.

51. As a direct result of the Counter-Notice submitted by Attorney Rapkin, the 17-Videos identified therein were placed on a restoration track and were scheduled to be reinstated absent judicial intervention.

52. Plaintiff commenced this action and provided notice to YouTube in order to prevent reinstatement of the videos and to mitigate the harm caused by the false and misleading representations made in the Counter-Notice.

53. The restoration of the 17-Videos, or the imminent and automatic reinstatement process triggered by the Counter-Notice, caused Plaintiff to incur legal fees, enforcement costs, and other damages, and constitutes actionable injury under 17 U.S.C. § 512(f).

**FIRST AMENDED COMPLAINT**

54. As a direct result of the false Counter-Notice, Plaintiff was forced to initiate this federal litigation within the strict 10–14 day statutory window under § 512(g)(2)(C) to prevent the automated restoration of the infringing content. The damages incurred under § 512(f) include the attorneys' fees and costs necessitated by this filing, which was the only mechanism available to prevent the reliance on Attorney Rapkin's misrepresentations from resulting in the physical replacement of the 17-Videos. To hold that restoration must be complete before a claim is ripe would perversely reward Defendants for successful misrepresentations that force immediate, costly legal intervention.

*__The Counter-Notice Contained Material Misrepresentations__*

55. In the Counter-Notice, Attorney Rapkin asserted under penalty of perjury that the 17-Videos were removed "by mistake or misidentification" and that each was "significantly transformed by detailed editing and elaborate commentary throughout." These assertions were materially false.

56. Upon information and belief, Attorney Rapkin did not view or review each of the 17-Videos before submitting the Counter-Notice. Had she done so, she would have known that at least eight videos contained no commentary of any kind, rendering her sworn statement that each video contained "elaborate commentary throughout" factually impossible.

57. In reality, the 16 counter-noticed Shorts fall into three categories, none of which support a fair use defense:

58. **Category 1: Short Videos with No Commentary Whatsoever (8 videos)**: These Shorts consist entirely of Plaintiff's copyrighted footage, often paired with other copyrighted material (e.g., movie or television clips) for mockery. There is not a single word of narration, commentary, or critique in these videos, directly contradicting Rapkin's blanket claim under penalties of perjury of "elaborate commentary throughout."

//
//
//

59. **Category 2: Short Videos Featuring Publicly Available Government Footage (3 videos)**[2]: These clips depict public meetings or hearings that were already published by government entities on their official YouTube channels such as the City of Englewood, Colorado. Rather than using those public sources, the Exposer copied Plaintiff's original curated footage for convenience, better audio/video quality, or camera angles, none of which justify appropriation under fair use.

60. **Category 3: Videos with Trivial or Token Commentary (6 videos)**: These include brief and meaningless phrases or sarcastic clips from copyrighted movies and TV shows. None of these qualify as "elaborate commentary throughout," the phrase Rapkin certified under penalty of perjury in the Blanket Counter-Notice.

61. The one long-form video at issue contains substantial portions of Plaintiff's footage along with at least 14 copyrighted clips or images from TV shows such as *Ren & Stimpy*, *Futurama*, *The Simpsons*, *The Office*, and *Extra.*

62. Despite these clear deficiencies, Attorney Rapkin submitted the blanket Counter-Notice declaring that all 17-Videos were "significantly transformed by detailed editing and elaborate commentary throughout."

63. As alleged above, that statement was knowingly false.

64. Attorney Rapkin's certification was not a good-faith mistake regarding a debatable legal theory; it was a material misrepresentation of the nature of the edits. By labeling a video made up of stolen IP as elaborate commentary, Defendants sought to deceive YouTube into bypassing its manual review process.

65. The Counter-Notice was part of a coordinated scheme to preserve monetized infringing content while concealing the identity of the true channel operator. Attorney Rapkin acted as a proxy or agent, with no firsthand knowledge sufficient to make the sworn statements required by 17 U.S.C. § 512(g).

---

[2] One Short Video falls into Categories 1 and 2 as it has no commentary and public domain footage was available

***Attorney Rapkin's Continuing Concealment Confirms Knowing and Material Misrepresentation***

66. As required by 17 U.S.C. § 512(g)(3)(D), a valid DMCA counter-notice must include "the subscriber's name, address, and telephone number." The Counter-Notice submitted by Attorney Rapkin did not identify the subscriber who owns or controls the Exposé Channel. Instead, Attorney Rapkin substituted her own contact information, thereby concealing the identity of the Exposer.

67. The omission of the Exposer's identifying information was material. By withholding his name and address, the Counter-Notice frustrated Plaintiff's ability to identify, serve, and pursue the actual infringer, and directly caused Plaintiff to incur attorney's fees and related costs in attempting to uncover the Exposer's identity. To date, the Exposer's identity remains unknown to Plaintiff.

68. After this action was commenced, Attorney Rapkin continued to withhold the identity of the Exposer. In her Rule 26(a)(1) disclosures, Rapkin identified "John Doe d/b/a 'The Exposer'" as an individual with discoverable information central to the defenses in this case, yet refused to disclose that individual's name, physical address, or contact information.

69. Attorney Rapkin's ongoing refusal to identify the subscriber was not inadvertent. It occurred after Plaintiff specifically sought the subscriber's identity, after litigation had commenced, and after Attorney Rapkin had acknowledged that the subscriber was the person who posted the videos at issue and possessed discoverable information regarding the Counter-Notice.

70. This continuing concealment is consistent with, and confirms, the knowing and material misrepresentations made in the Counter-Notice itself. By certifying under penalty of perjury that each of the 17-Videos was "significantly transformed by detailed editing and elaborate commentary throughout," while simultaneously withholding the subscriber's identity, Rapkin acted to preserve the effects of the false Counter-Notice and to delay or prevent judicial review of its accuracy.

71. Attorney Rapkin's conduct before and after the submission of the Counter-Notice demonstrates that the misrepresentations were not the product of mistake or negligence, but part of a deliberate course of conduct designed to maintain anonymity, frustrate enforcement of Plaintiff's copyrights, and prolong the effects of the false Counter-Notice.

72. At a minimum, Attorney Rapkin acted with reckless disregard for the truth of the statements made in the Counter-Notice. As an attorney submitting a sworn certification under penalty of perjury, Attorney Rapkin was required to exercise reasonable care and diligence to ensure that the representations made were accurate.

73. Attorney Rapkin failed to exercise reasonable care by submitting a blanket Counter-Notice asserting that each of the identified videos was "significantly transformed by detailed editing and elaborate commentary throughout," despite the fact that multiple videos contained no commentary at all and no plausible basis for a claim of mistake or misidentification.

74. Had Attorney Rapkin acted with reasonable care or in good faith, she would have had no substantial doubt that at least some of the counter-noticed videos could not satisfy the representations made in the counter-notification. Her decision to certify those statements anyway constitutes knowing and material misrepresentation within the meaning of 17 U.S.C. § 512(f).

75. Attorney Rapkin's continued refusal to identify the subscriber who posted the videos further confirms that the misrepresentations were not inadvertent, but the result of willful blindness or reckless disregard for the truth.

***Attorney Rapkin Acted as a Procedural Proxy Rather Than Independent Counsel***

76. Attorney Rapkin submitted the Counter-Notice as purported legal counsel for the Exposé Channel yet declined to identify the person who owned or controlled that YouTube channel, even after litigation commenced and after acknowledging that the subscriber possessed discoverable information central to the defenses asserted.

77. Attorney Rapkin's conduct is inconsistent with the role of independent legal counsel exercising professional judgment regarding the accuracy of sworn statements submitted under penalty of perjury. Rather than evaluating the individual videos identified in the Counter-Notice, Attorney Rapkin submitted standardized and conclusory "fair use" assertions across numerous non-homogeneous videos, including videos containing no commentary at all.

78. The Counter-Notice relied almost exclusively on formulaic language invoking "fair use," "commentary," and "parody," mirroring the precise terminology required to trigger YouTube's automated reinstatement process, and requesting restoration of the 17-Videos absent judicial review.

79. Rapkin's refusal to identify the subscriber, combined with her blanket certification of fair use and immediate demand for reinstatement, supports a reasonable inference that the Counter-Notice was submitted for the limited purpose of restoring the videos through YouTube's statutory mechanism, rather than to correct a genuine mistake or misidentification.

80. At a minimum, Attorney Rapkin acted with reckless disregard for the truth by serving as a procedural intermediary to invoke the counter-notice process without exercising reasonable care to verify the factual accuracy of the representations made on behalf of the owner of the Exposé Channel.

81. Attorney Rapkin lacked any apparent basis to certify the fair use status of the 17-Videos without reviewing them, particularly given the technical and fact-intensive nature of U.S. copyright fair use analysis.

82. Plaintiff now seeks damages, attorneys' fees, declaratory and injunctive relief for Defendants' material misrepresentations in the Counter-Notice submitted to YouTube.

//
//
//
//

**FIRST AMENDED COMPLAINT**

# FIRST CAUSE OF ACTION

## Misrepresentation in Counter-Notifications under the DMCA

### (17 U.S.C. § 512(f))

### (Against Attorney Rapkin and the Exposer)

83. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 82.

84. Section 512(f)(2) of the Copyright Act provides, in relevant part, that "**_any person_** who knowingly materially misrepresents under this section . . . that material was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner…who is injured by such misrepresentation..." (emphasis added).

85. The Counter-Notice submitted by Attorney Rapkin and the Exposer was false, and knowingly so at the time it was filed. Attorney Rapkin falsely represented, under penalty of perjury: (1) that each of the 17-Videos "was significantly transformed by detailed editing and elaborate commentary throughout"; and (2) that each video was protected by fair use and removed "due to a mistake or misidentification." These statements were materially false. At least eight of the Videos contain no commentary whatsoever, and none was transformed by detailed editing or any meaningful interjection.

86. Attorney Rapkin made these knowingly false statements in an effort to preserve or re-monetize the 17-Videos on the Exposé Channel.

87. Plaintiff does not allege that Attorney Rapkin violated § 512(f) merely by advancing an incorrect or debatable legal interpretation of fair use. Rather, Plaintiff alleges that Attorney Rapkin knowingly misrepresented objective, verifiable facts about the content of the 17-Videos themselves. Specifically, that the contained "elaborate commentary throughout," when multiple videos contained none.

88. Attorney Rapkin's subsequent refusal to identify the subscriber who operates the Exposé Channel further confirms that the misrepresentations were knowing and

material, and not the result of inadvertence or good-faith mistake.

89. Attorney Rapkin knowingly and materially misrepresented that the 17-Videos were removed due to mistake or misidentification. At a minimum, Attorney Rapkin acted with reckless disregard for the truth and failed to exercise reasonable care or diligence, such that she would have had no substantial doubt as to the falsity of the representations had she acted in good faith.

90. Attorney Rapkin's misrepresentations caused YouTube to initiate the statutory reinstatement process under 17 U.S.C. § 512(g), forcing Plaintiff to file this action to prevent restoration of the 17-Videos. Liability under § 512(f) does not require Plaintiff to allow reinstatement to occur; it is sufficient that the Counter-Notice triggered restoration and caused Plaintiff to incur damages to prevent it.

91. Attorney Rapkin cannot shield herself from liability under § 512(f) by pleading ignorance of the law. While the "knowing" standard requires subjective bad faith, that bad faith is evidenced here by a willful blindness to the objective facts. Rapkin certified under penalty of perjury that the 17-Videos contained elaborate commentary throughout, yet 8 of those videos contained zero. A total absence of the very feature being certified is a factual lie, not a legal opinion, and no amount of copyright inexperience excuses a false statement regarding the contents of the videos she was certifying.

92. As a direct result of the Defendants' material misrepresentations, Plaintiff was forced to initiate this action to prevent YouTube from restoring the 17-Videos. Plaintiff is entitled to recover damages, costs, and attorneys' fees under 17 U.S.C. § 512(f).

93. Plaintiff is further entitled to injunctive relief barring YouTube or its agents from restoring the 17-Videos to public view.

//
//
//
//
//

**FIRST AMENDED COMPLAINT**

## SECOND CAUSE OF ACTION

### Declaratory Judgment, 17 U.S.C. § 512(g)(2)(C) and 28 U.S.C. § 2201

### (Against the Exposer)

94. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 93.

95. An actual, present, and justiciable controversy exists between Plaintiff and The Exposer concerning the Exposer's unauthorized use of the 17-Videos.

96. Plaintiff contends that the Exposer's use of the 17-Videos is not protected under the doctrine of fair use, 17 U.S.C. § 107, because the videos reproduce substantial portions of Plaintiff's copyrighted works without authorization, lack meaningful transformative commentary, and function as substitutes for the original works.

97. Through counsel, Attorney Rapkin asserted in the Counter-Notice that the Exposer's use of the 17-Videos was protected by fair use and demanded reinstatement of the removed videos pursuant to 17 U.S.C. § 512(g). The Exposer has adopted and relied upon those representations.

98. The Exposer has publicly stated on multiple occasions that he intends to repost the 17-Videos to the Exposé Channel if permitted by YouTube, and has continued to assert a right to do so notwithstanding Plaintiff's objections and this pending litigation.

99. As a direct result of the Counter-Notice, YouTube initiated the statutory reinstatement process under 17 U.S.C. § 512(g), placing the 17-Videos on a restoration track and requiring Plaintiff to commence legal action to prevent their reinstatement.

100. Absent a judicial declaration resolving whether the Exposer's use of the 17-Videos is lawful, Plaintiff faces a continuing and imminent threat that the 17-Videos will be restored, reposted, or otherwise republished, causing ongoing and irreparable harm.

101. Plaintiff therefore seeks a declaration pursuant to 28 U.S.C. § 2201 and 17 U.S.C. § 512(g)(2)(C) that the Exposer's use of the 17-Videos is not authorized by 17 U.S.C. § 107 and does not constitute fair use.

102. Plaintiff further seeks injunctive relief prohibiting the Exposer from reposting,

publishing, or causing the restoration of the 17-Videos, and prohibiting YouTube from restoring the 17-Videos pursuant to the Counter-Notice.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Executive Lens LLC, prays for judgment against Defendants as follows:

A. That judgment be entered in favor of Plaintiff and against Attorney Rapkin and the Exposer for monetary damages caused by their knowing material misrepresentations in the Counter-Notice pursuant to 17 U.S.C. § 512(f);

B. That the Court enter a declaratory judgment that the Exposer's use of the 17-Videos is not protected by 17 U.S.C. § 107;

C. A permanent injunction enjoining the Exposer from further use of the 17-Videos and requiring YouTube and any third-party platforms under the Exposer's control to remove the 17-Videos and prevent further dissemination as authorized by law;

D. An award of attorneys' fees and costs pursuant to 17 U.S.C. § 512(f);

E. Any other relief the Court deems just and proper.

Dated:  December 30, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Executive Lens LLC*