RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
270 Madison Ave., 10th Floor
New York, NY 10016
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
 *Executive Lens LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE LENS LLC, | Case No. 25-cv-06048-NC |
| Plaintiff, | **HON. NATHANAEL M. COUSINS** |
| vs. | **DECLARATION OF RANDALL S. NEWMAN IN RESPONSE TO DOCKET NO. 44** |
| LEE RAPKIN and JOHN DOE dba "the Exposer" www.youtube.com/@1aAuditsExposé | |
| Defendants. | |

**Declaration of Randall S. Newman in Response to Docket No. 44**

## <u>DECLARATION OF RANDALL S. NEWMAN</u>

I, Randall S. Newman, hereby declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am an attorney duly licensed to practice before this Court and am the attorney for Plaintiff Executive Lens LLC ("Plaintiff"). Unless otherwise stated, I have personal knowledge of the facts stated herein and if called as a witness could competently testify thereto.

2.    I file this Declaration in response to the Court's May 13, 2026 Order requiring me to file a Declaration under penalty of perjury explaining the comment referenced in Docket No. 43 at pp. 11-13 and why it does not constitute sanctionable unprofessional conduct.

3.    I have practiced law for almost three decades, including substantial litigation practice in state and federal courts throughout the country.

4.    Prior to the events described herein, I had never operated a YouTube channel or participated in the type of online livestream and commentary environment that ultimately gave rise to the issues presently before the Court.

5.    The underlying litigation in this matter arose within a highly unusual online environment involving YouTube content creators referred to as "First Amendment auditors." Individuals in this YouTube genre create and publish videos documenting interactions with government officials and public employees, often to test compliance with constitutional rights.

6.    A corresponding group of creators, sometimes referred to as "anti-auditors," obtain auditor videos from YouTube and produce reaction content that mocks those videos under theories of fair use. Within the anti-auditor community, First Amendment auditors are frequently referred to as "frauditors," a derogatory term used to describe such creators.

7.    John Doe operated a YouTube channel under the name 1a Audits Exposé.

8.    Auditors and anti-auditors operate within the same YouTube ecosystem and

1

**Declaration of Randall S. Newman in Response to Docket No. 44**

frequently engage in direct, public exchanges through videos, livestreams, and comment sections. The content in this space is informal, adversarial, and performative, and commonly includes satire, exaggeration, insults, and provocative language intended to generate audience engagement.

9.    Beginning in June 2025, I became involved in copyright litigation in this District representing auditors against anti-auditors. The first case filed was *Cordova v. Huneault*, Case No. 25-cv-04685-VKD. The plaintiff in that case, Christopher J. Cordova ("Mr. Cordova") is the sole owner of Executive Lens LLC, the plaintiff in this matter.

10.    At or around the time I filed the *Cordova v. Huneault* litigation, I created a YouTube channel called "The DMCA Lawyer," which I initially viewed as a means to discuss copyright law issues and publicly respond to commentary concerning the litigation.

11.    After filing the *Cordova v. Huneault* litigation, I became the subject of repeated public commentary, criticism, ridicule, memes, livestream discussions, and online attacks by various YouTube creators and commenters. John Doe participated in some of those online attacks.

12.    Through my involvement in these matters, I became aware of disputes concerning whether certain anti-auditor creators were complying with the requirements of 17 U.S.C. § 512(g)(3)(D), which requires a DMCA counter-notification to include the subscriber's name, address, and telephone number.

13.    Specifically, I became aware that certain creators were using attorneys to submit counter-notifications without publicly disclosing the identity of the underlying subscriber.

14.    In another matter pending in this District, *Executive Lens LLC v. Reed*, Case No. 25-cv-07150-SVK, I encountered circumstances in which an attorney submitted counter-notifications on behalf of anonymous creators without personally reviewing the videos at issue. That experience contributed to my concern regarding the use of attorneys to shield the identity of anonymous channel operators.

15.    In July 2025, Mr. Cordova submitted several DMCA takedown notices to

2

**Declaration of Randall S. Newman in Response to Docket No. 44**

YouTube concerning videos appearing on John Doe's 1a Audits Exposé channel.

16.    In those videos, John Doe used substantial portions of Mr. Cordova's videos while also directing repeated mocking and insulting commentary toward Mr. Cordova.

17.    Thereafter, John Doe published several videos concerning the DMCA takedown notices and publicly stated that the channel was owned by a corporation and that Plaintiff would never discover his identity in order to enforce the copyrights at issue.

18.    Plaintiff thereafter received correspondence from YouTube forwarding a counter-notification purportedly submitted by Defendant Lee Rapkin ("Ms. Rapkin").

19.    The counter-notification did not include the name, address, or telephone number of John Doe as required by 17 U.S.C. § 512(g)(3)(D).

20.    In response to the counter-notification, Plaintiff commenced this litigation to prevent restoration of the videos pending resolution of the parties' dispute.

21.    On or about August 7, 2025, I spoke with Brandon Franklin of Clyde & Co. US LLP who advised that he would be representing Ms. Rapkin in this matter.

22.    Mr. Franklin further stated that he would not be representing John Doe due to what he described as a conflict of interest between Ms. Rapkin and John Doe.

23.    I found this unusual because, in my experience with DMCA litigation, the interests of the attorney submitting the counter-notification and the anonymous subscriber are ordinarily aligned.

24.    Mr. Franklin further indicated that he would not disclose John Doe's identity to me and did not provide any substantive explanation for why John Doe's identity needed to remain undisclosed beyond the assertion that John Doe wished to remain anonymous.

25.    On August 25, 2025, I received correspondence from The Law Offices of Steven C. Vondran, P.C. ("Mr. Vondran"), advising that he would represent John Doe and would agree to waive service of process. However, Mr. Vondran ultimately declined to provide John Doe's identity and did not execute a waiver of service.

26.    In or about November 2025, I became aware of online speculation within the auditor/anti-auditor community that Ms. Rapkin and John Doe may have had a personal

3

**Declaration of Randall S. Newman in Response to Docket No. 44**

relationship outside the ordinary attorney/client context. The speculation arose from publicly available social media photographs posted on Ms. Rapkin's Facebook profile that some online commenters believed resembled the avatar associated with John Doe's YouTube channel. However, because John Doe utilized a cartoon avatar rather than an actual photograph, I had no way to confirm whether any such speculation was accurate.

27.   On December 11, 2025, Ms. Rapkin served Plaintiff with initial disclosures. In those disclosures, Ms. Rapkin identified John Doe as a witness but did not provide John Doe's identity or contact information.

28.   On December 19, 2025, the parties submitted a Joint Discovery Letter in which Plaintiff sought an order compelling disclosure of John Doe's identity and address. (ECF No. 18).

29.   Despite the online speculation discussed above, I did not include any allegations or theories concerning a possible personal relationship between Ms. Rapkin and John Doe in the Joint Discovery Letter because I did not believe it would be appropriate to place unsupported speculation before the Court.

30.   On December 20, 2025, I participated in a livestream on the "Dr. Dave Frauditor Terminator" YouTube channel. That channel is operated by David R. Coulter ("Mr. Coulter").

31.   A creator who operates the "Frauditor Mania" YouTube channel also participated in the livestream.

32.   Frauditor Mania and John Doe frequently collaborated on livestreams and other online commentary concerning Mr. Cordova and the underlying litigation.

33.   During the livestream, the participants briefly discussed the Joint Discovery Letter that had been filed the previous day concerning Plaintiff's efforts to obtain disclosure of John Doe's identity.

34.   During that discussion, I referenced the online speculation discussed above concerning whether John Doe and "his lawyer" may have had a relationship outside the ordinary attorney/client context. I also expressed confusion regarding the extent to which

**Declaration of Randall S. Newman in Response to Docket No. 44**

resources were being devoted to maintaining John Doe's anonymity.

35.    At no point during the livestream did I mention Ms. Rapkin by her first or last name, identify the 1a Audits Exposé channel, or otherwise expressly identify the individuals being discussed.

36.    On December 23, 2025, Mr. Vondran posted insulting comments on my YouTube channel and thereafter sent me fifteen hostile emails containing personal insults unrelated to any litigation issue.

37.    In those emails, Mr. Vondran referred to me using terms such as "clown," "coward," and "wimp and a weasel," and also made disparaging comments concerning my professional career and personal character.

38.    I did not respond in kind, seek court intervention, or otherwise raise the issue before the Court.

39.    To Mr. Vondran's credit, he later apologized for the emails.

40.    On December 30, 2025, I filed the First Amended Complaint ("FAC") in this action (ECF No. 20).

41.    I did not include any allegations concerning the online speculation discussed above or otherwise suggest in the FAC that Ms. Rapkin and John Doe were not involved in a legitimate attorney/client relationship.

42.    On January 10, 2026, I appeared on a public livestream hosted by Mr. Coulter. Two additional YouTube personalities also participated in the livestream, namely "Frauditor Mania" and Paul J. Cohen.

43.    The livestream lasted several hours, and I participated for more than an hour discussing copyright litigation, YouTube disputes, and related online commentary.

44.    During the public livestream, the participants briefly discussed the fact that John Doe continued to oppose disclosure of his identity. At no point during the public livestream did I mention Ms. Rapkin by name or discuss any alleged relationship between Ms. Rapkin and John Doe.

45.    After the livestream concluded, I remained on the non-public backstage

**Declaration of Randall S. Newman in Response to Docket No. 44**

portion of the StreamYard platform with Frauditor Mania and the other participants.

46. During the backstage discussion, I specifically asked whether the conversation was being recorded and was told that the backstage portion "doesn't get recorded" and that recording was only possible when participants were "on stage."

47. Based upon those representations, I reasonably believed the backstage discussion was private and non-public and did not believe the conversation was being recorded or would later be published.

48. It is my understanding that the backstage discussion lasted approximately ninety minutes. During that discussion, I again raised the issue of the costs and difficulty associated with litigating the anonymity dispute concerning John Doe. As I attempted to explain the issue, Frauditor Mania frequently interrupted me and spoke over me in the informal conversational environment.

49. During the course of that discussion, I made one inelegant and informal remark referencing the online speculation discussed above, stating that the only explanation that "made sense" for why so much effort and expense was being devoted to maintaining "your friend's" anonymity was because "he's banging the lawyer." The remark was intended as a reference to the online speculation discussed above.

50. At no point during the backstage discussion did I mention "Lee Rapkin," "Rapkin," the "1a Audits Exposé" YouTube channel, or "the Exposer." Rather, I referred only generally to "your friend" and "the lawyer."

51. On January 13, 2026, Ms. Rapkin filed a Motion to Dismiss Plaintiff's FAC (ECF No. 27).

52. On January 23, 2026, Magistrate Judge DeMarchi entered an order on defendants' motion to dismiss in *Cordova v. Huneault*, 817 F. Supp. 3d 819 (N.D. Cal. 2026).

53. Judge DeMarchi's decision received substantial attention and discussion within the broader YouTube community because it permitted Mr. Cordova's claims under 17 U.S.C. § 1201 to proceed past the pleading stage.

6

**Declaration of Randall S. Newman in Response to Docket No. 44**

54.    On January 27, 2026, Plaintiff filed its opposition to Ms. Rapkin's Motion to Dismiss. Plaintiff again did not include any allegations concerning the online speculation discussed above or otherwise suggest that Ms. Rapkin and John Doe were not involved in a legitimate attorney/client relationship.

55.    On or about February 6, 2026, Mr. Coulter published a portion of the backstage recording discussed above. Additional portions of the backstage discussion were later published in videos released on or about February 7 and 9, 2026.

56.    At the beginning of the February 6, 2026 video, Mr. Coulter said:

Today's video takes us to a live stream that was broadcast by me. That's right, Dr. Dave. And when Randy Boy decided he wanted to stay on and talk…I said "sure, I'll leave the stream on." Of course, this was off air, but you know what? Don't trust a snake because a snake is always a snake…Dave will throw anybody under the bus.

57.    Coulter's comments further reinforced my understanding that the backstage discussion was understood by participants to be off-air and non-public.

58.    On or about February 9, 2026, Coulter released an additional portion of the backstage recording together with commentary and edits discussing the remarks made during the backstage discussion.

59.    Again, at no point during the backstage discussion did I mention Ms. Rapkin by name, refer to "the Exposer," identify the 1a Audits Exposé channel, or otherwise expressly identify the individuals being discussed. Rather, I referred only generally to "your friend" and "the lawyer." A viewer unfamiliar with the broader online disputes would not know the identities of the persons being referenced absent later commentary and editorial framing added by Mr. Coulter.

60.    On February 17, 2026, John Doe filed an opposition to Plaintiff's Motion to Compel Disclosure of John Doe's identity and address (ECF No. 33). In that filing, John Doe opposed disclosure of his identity but did not articulate any substantive reason why his identity needed to remain anonymous.

7

**Declaration of Randall S. Newman in Response to Docket No. 44**

61.    On February 25, 2026, I filed a Reply in Support of Plaintiff's Motion to Compel Disclosure of John Doe's Identity (ECF No. 35).

62.    Plaintiff again did not include any allegations concerning the online speculation discussed above or otherwise suggest that Ms. Rapkin and John Doe were not involved in a legitimate attorney/client relationship.

63.    On March 10, 2026, the Court continued the Case Management Conference to May 13, 2026 and directed the parties to file an updated Joint Case Management Statement by May 6, 2026.

64.    On March 19, 2026, the Court denied Ms. Rapkin's Motion to Dismiss Plaintiff's FAC (ECF No. 37).

65.    Similar to Magistrate Judge DeMarchi's decision in *Cordova v. Huneault*, the Court's March 19, 2026 decision addressed significant issues concerning claims under 17 U.S.C. § 512(f), including whether restoration of the videos by YouTube was required before such a claim could proceed. It is my understanding that the Court's decision has since been selected for publication in the Federal Supplement.

66.    On or about April 21, 2026, counsel for Ms. Rapkin contacted me to schedule a meet-and-confer regarding the updated Joint Case Management Statement.

67.    The parties conducted that meet-and-confer on April 22, 2026. During the meet-and-confer, counsel for Ms. Rapkin did not raise any issue concerning the January 10, 2026 livestream or the subsequently published backstage recordings. Counsel also indicated that they would prepare an initial draft of the updated Joint Case Management Statement by April 24, 2026.

68.    On April 25, 2026, I sent counsel for Ms. Rapkin a settlement demand.

69.    After not receiving the anticipated draft of the updated Joint Case Management Statement, I sent a follow-up email on April 29, 2026 requesting the proposed draft.

70.    Counsel for Ms. Rapkin responded on April 30, 2026 and stated that a draft would be circulated the following day.

Declaration of Randall S. Newman in Response to Docket No. 44

71. On May 1, 2026, I received an email from "Frauditor Mania" requesting that I contact him regarding an "URGENT" copyright matter. I did not respond.

72. Counsel for Ms. Rapkin ultimately circulated a draft of the updated Joint Case Management Statement on May 5, 2026, the day before the filing deadline.

73. The draft Joint Case Management Statement was the first time counsel for Ms. Rapkin raised concerns regarding the January 10, 2026 backstage discussion and the subsequently published recordings.

74. On May 6, 2026, the parties filed the updated Joint Case Management Statement (ECF No. 43).

75. On May 11, 2026, Mr. Coulter sent me an email with the subject line "Problems With My Video?" stating in part: "I understand there may be a potential problem with a video I posted of you. I can fix that problem, and I do not mean by deleting the video. No, I have a much better idea. If you are interested, reply and let me know."

76. Mr. Coulter's email further confirmed that he retained control over publication of the videos containing the backstage discussion. I did not respond to Mr. Coulter's email.

77. In hindsight, I recognize that the remark made during the informal conversation was intemperate and could have been expressed more appropriately. However, the remark occurred during what I believed was an off-air, non-recorded exchange among multiple online personalities engaged in mutual banter and insults. I did not authorize publication of the recording, did not repeat the remark publicly thereafter, and did not intend the comment to threaten, harass, or interfere with any participant or any aspect of this litigation.

78. Moreover, I have taken affirmative steps to eliminate any potential for further controversy or misunderstanding.

79. In March 2026, I discontinued the use of my YouTube channel as a platform for legal commentary. The channel has been repurposed as a travel-related channel, and I

**Declaration of Randall S. Newman in Response to Docket No. 44**

no longer post content relating to legal matters or ongoing disputes nor have I appeared on other YouTube channels.

80. These actions were not taken as an acknowledgment of wrongdoing, but rather to avoid further unnecessary controversy, ensure that my time remains focused on my professional obligations, and avoid any appearance that my conduct could reflect adversely on the legal profession.

81. As discussed above, the comment referenced in the parties' Joint Statement arose from a livestream that occurred on or about January 10, 2026.

82. Importantly, the comment at issue did not occur during the public livestream portion of the discussion.

83. Rather, the comment occurred only after the public livestream had concluded and during what I understood to be a private backstage or off-air discussion among participants.

84. At no point during the backstage discussion did I mention "Lee Rapkin," "Rapkin," "the Exposer," or the "1a Audits Exposé" YouTube channel. Rather, I referred only generally to "your friend" and "the lawyer."

85. At the time of the backstage discussion, I was physically located in the State of Florida, where I maintain residency. The participants in the backstage discussion were aware that I resided in Florida and was physically located there during the livestream.

86. During the backstage discussion, I was expressly informed that the discussion was "off air," was not being recorded, and could not be recorded.

87. Based on those representations, I reasonably understood the discussion to be private and non-public.

88. My understanding that the discussion was private was further reinforced by the fact that I was located in Florida, a two-party consent state, and understood that non-public conversations were not permitted to be secretly recorded and publicly disseminated without consent. *See* Fla. Stat. § 934.03.

89. The backstage discussion occurred only after the public livestream had

10

**Declaration of Randall S. Newman in Response to Docket No. 44**

concluded and after participants had represented that the conversation was off-air and not being recorded.

90.    Had I understood that the discussion was being recorded or would later be publicly disseminated, I would not have participated in the discussion and would have immediately exited the conversation.

91.    I did not believe I was making public statements for dissemination to viewers, litigants, or the public generally.

92.    Importantly, the remark at issue occurred only after the public livestream had concluded and during what I believed to be a private backstage discussion.

93.    I also deliberately chose not to pursue any legal action against Mr. Coulter concerning publication of the backstage recording because I did not wish to create additional controversy or unnecessarily amplify the private discussion through further public litigation.

94.    In hindsight, I recognize that the remark reflected unnecessary informality.

95.    Nevertheless, the remark occurred within a highly unusual and emotionally charged YouTube environment involving ongoing public attacks, livestream disputes, online ridicule, and informal exchanges among multiple online personalities.

96.    Despite that environment, I consistently refrained from placing the online speculation discussed above into pleadings, motions, discovery filings, or other submissions to the Court.

97.    As discussed above, since March 2026, I have completely disengaged from YouTube-related legal commentary and online disputes. I no longer post content relating to legal matters or ongoing litigation and have not appeared on other YouTube channels.

98.    Under the totality of the circumstances, I respectfully submit that the isolated backstage remark at issue does not warrant sanctions or a finding of unprofessional litigation conduct.

99.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Declaration of Randall S. Newman in Response to Docket No. 44**

Executed on this 27th day of May, 2026.

s/ Randall S. Newman
Randall S. Newman

**Declaration of Randall S. Newman in Response to Docket No. 44**